IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

WILLIAM J. FLOHRS,

       Plaintiff,

       v.                     Case No. 12-2439-SAC

ELI LILLY AND COMPANY,

       Defendant.


MEMORANDUM AND ORDER

     This case comes before the Court on Defendant Eli Lilly and Company's motion for summary judgment and related motions to strike or permit the filing of various briefs. Liberally construed, Plaintiff's complaint contends that he was orally misinformed by a Benefits Helpdesk employee that he would receive a substantially greater amount of retirement benefits if he deferred for five years his date to start receiving benefits. Defendant[1] contends that this case is barred by the ERISA Plan's one-year contractual limitations period; that Plaintiff previously released this claim in his Severance Agreement; and that Plaintiff's claim fails to states a claim under Tenth Circuit law because it is a claim for equitable estoppel/misrepresentation for pension benefits from an ERISA plan. For the reasons set forth below, the Court agrees that summary judgment must be granted.

---

[1] All references to "Defendant" in this order are solely to Defendant Eli Lilly and Company, and not to any other defendant.

## I. Motions to Strike/Permit Surreplies

Plaintiff has moved for leave to file a surreply and a "second response" to the pending summary judgment motion (Dk. 45)[2], and Defendant has moved to strike those same documents (Dk. 43, 44).

Although Plaintiff is acting pro se, he is undeniably aware of and bound to comply with the Court's rules, which are designed to provide procedural fairness to both parties. On October 30, 2012, the Magistrate Judge considered a surreply that Plaintiff had filed without leave of Court, but expressly warned the Plaintiff that "[i]n the future, [he] must request leave to file a surreply or risk having his brief stricken." (Dk. 36, p.1). The Court specifically informed the Plaintiff that "[t]here is no provision for the filing of a surreply absent leave of court." *Id.*, n. 1, citing *First Savings Bank, F.S.B. v. U.S. Bancorp*, 184 F.R.D. 363, 367 (D. Kan. 1998). *See* D. Kan. R. 7.1(c).

Nonetheless, only four days after that order, Plaintiff disregarded the Court's instruction by filing an unauthorized "second response" (Dk. 38) to the summary judgment motion. Approximately one week later, Plaintiff filed an unauthorized surreply (Dk. 41). Plaintiff now seeks leave of Court for those previously-filed documents, but offers no reason why he did not seek such leave before he filed them. Plaintiff's motion is thus untimely.

---

[2] Plaintiff's motion for leave to file a surreply seeks leave to file an "attached surreply," but attaches none. Instead, it seeks permission to file a surreply and a "second response," (Dk. 38, and 41) which Plaintiff previously filed without leave of Court.

But even if Plaintiff's motion for leave had been timely, it would have been denied. The documents at issue repeat some arguments previously made by the Plaintiff, and raise other issues for the first time. Courts in this district generally refuse to consider such matters. *Medina v. City of Osawatamie*, 992 F. Supp. 1269, 1272-73 (D. Kan. 1998) (regarding new matter in reply briefs); *Cf*, Fed. R. Civ. Pro. 12(f) (permitting the Court to strike any redundant matter from a pleading). Because briefing cannot continue *ad nauseam*, our rules contemplate only a motion and a response, and permit a reply.

For these reasons, as well as for those set forth in Defendant's briefs on this issue (Dks. 43, 44, 47), the Court denies Plaintiff leave to file any surreply or "second response," and grants the motions to strike the surreplies and surresponses already filed by the Plaintiff without leave of Court.

## II. Summary Judgment Standard

Rule 56 authorizes a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A fact is material if it would affect the outcome of a claim or defense under the governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "[T]he dispute about a material fact is 'genuine,' …, if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

On summary judgment, the initial burden is with the movant to point out the portions of the record which show that the movant is entitled to judgment as a matter of law. *Thomas v. Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir. 1992), *cert. denied,* 506 U.S. 1013 (1992). Instead of disproving a claim or defense, the movant need only show "a lack of evidence" on an essential element. *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir. 1998). If the movant meets that burden, the non-movant must come forward with specific facts based on admissible evidence from which a rational fact finder could find in the non-movant's favor. *Id.* The non-movant's "burden to respond arises only if the" movant meets its initial burden of production. *Neal v. Lewis,* 414 F.3d 1244, 1248 (10th Cir. 2005) (citation omitted). The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether the evidence is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52. Put another way, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *See Pinkerton v. Colorado Dept. of Transp.,* 563 F.3d 1052, 1058 (10th Cir. 2009).

In applying this standard, all inferences arising from the record must be drawn in favor of the nonmovant. *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1216 (10th Cir. 2003). Credibility determinations and the weighing of the evidence are jury functions, not those of a judge. *Id.* at 1216. Nevertheless, "the nonmovant must establish, at a minimum, 'an inference of the existence of each element essential to [her] case.' " *Croy v. COBE Laboratories, Inc.,* 345 F.3d 1199, 1201 (10th Cir. 2003) (quoting *Hulsey v. Kmart, Inc.,* 43 F.3d 555, 557 (10th Cir. 1994)).

### III. Uncontested Facts

#### The Plan

At all times relevant to this lawsuit, Lilly has sponsored a defined benefit pension plan ("the Plan") that is subject to the Employee Retirement Income Security Act of 1974 ("ERISA"). The Employee Benefits Committee ("EBC") is the Plan's administrator and, subject to the provisions of the Plan, has discretion and authority to interpret the terms and provisions of the Plan and to determine all questions arising under the Plan or in connection with the administration of the Plan. For purposes of administering claims under the Plan, the EBC delegated to the Benefit Plan Review Committee ("BPRC") the responsibility to review and issue a decision on initial claims for benefits by Plan participants or beneficiaries.  A Plan participant whose initial claim is denied by the BPRC may appeal to the EBC.

Copies of the Plan are available to Lilly employees and retirees upon request. Copies of the summary plan description for the Plan are available at the Lilly Benefits Center website, where it is accessible to employees and retirees.

The Plan includes a one-year "Limitations Period for Lawsuits," which states:

> No legal action may be commenced or maintained against the Plan more than one year after the Employee Benefits Committee wholly or partially denies, or is deemed to have wholly or partially denied, a claim for Plan benefits.

Dk. 20, Exh. A, 2008 Plan, p. 53, FLH000259. (The 2011 Plan contains identical language.)

## Plaintiff Retires with a Severance Agreement

Defendant provided its employees access to an online calculator which allowed Plan participants to estimate the amount of the pension benefits they would receive from the Plan, based on employment termination dates and benefit commencement dates they chose to input. Plaintiff used that tool to estimate his pension benefits multiple times in 2007 and 2008.

On October 8, 2008, Plaintiff called Defendant's Benefits Helpdesk, asked about his pension benefits, and was told that he would receive a "substantially greater" amount of benefits if he waited five years to begin receiving them.

Plaintiff retired on October 31, 2008, following his election to receive an enhanced severance of $202,918.83 (less applicable taxes and

withholdings) in conjunction with his departure from Lilly. As consideration for his receipt of that payment, Plaintiff executed a "Severance Agreement and Release of Claims for Voluntary Package."  In that Severance Agreement, Plaintiff agreed to release all claims against the Defendant, stating:

> [I] give up all of My Claims to the fullest extent permitted by law, and I agree to abide by this Agreement in all respects. I will not bring any lawsuits against the Company or make any demands against the Company for compensation or damages relating to My Claims. The Severance Benefit that I am receiving under this Plan is a fair compromise for my undertakings in this Agreement.

(Elliott Affidavit, Ex. A-1, LLY-FLH000055).

In May of 2010, less than two years after his retirement, Plaintiff elected to begin receiving his pension benefits under the Plan on June 1, 2010. In response to Plaintiff's election, Defendant promptly provided Plaintiff with information regarding his rights under the Plan, including documents confirming his election and explaining the calculation of his monthly pension benefits, the different forms of payments he could receive, and additional information that would be forthcoming.

### Plaintiff's Administrative Claim and Appeals

In June of 2010, Plaintiff made a claim to Defendant, requesting $73,000 in additional benefits from the Plan. Plaintiff asserted that he received misinformation that caused him to delay commencing his receipt of pension benefits from the Plan. The BPRC denied that claim.

In October of 2010, Plaintiff appealed the denial of his claim to the EBC, requesting not only $73,000 in back benefits, but also transcripts of the calls he had made in 2008 to the Benefits Helpdesk. The next day, Plaintiff wrote another letter to the EBC demanding additional benefits. On appeal, Plaintiff contended that Defendant led him to believe that if he waited to start receiving benefits, his benefit amount would substantially increase; that Defendant had lied to him; and that Defendant should retroactively award him the amount he sought. The EBC denied Plaintiff's administrative appeal on November 22, 2010.

Plaintiff also wrote to the EBC on November 18, 2010, restating his arguments, and requesting information about his 2008 calls to the Lilly Benefits Helpdesk and the estimates he processed with the online pension benefits calculator in 2007 and 2008. The BPRC responded to Plaintiff's letter on December 23, 2010, stating that Plaintiff had used the online pension benefits calculator in 2007 and 2008 on the following dates ("calculation status dates"), and had selected the following termination and benefit commencement dates:

| Calculation Status Date | Earliest Termination Date | Earliest Benefit Commencement Date |
| --- | --- | --- |
| 12-31-2007, 01-05-2008, and 01-06-2008 | 08-23-2013 | 09-01-2013 |
| 12-31-2007, 01-04-2008, and 01-05-2008 | 11-08-2021 | 12-01-2021 |

| 01-06-2008 | 12-31-2007 | 12-01-2021 |
|------------|------------|------------|
| 08-12-2008 | 10-30-2008 | 11-08-2008 |

DK. 20, Exh. 1, LLY-FLH000042. The letter also explained that calls made in 2007 or 2008 to the Benefits Helpdesk were no longer available because Defendant retained such calls for only sixteen months, and that it could provide no additional information about such calls. *Id.*

Plaintiff restated his arguments in letters to the EBC on December 29, 2010, and on February 3, 2011. Sheila Elliott, in her capacity as Director of Benefits Administration, responded to Plaintiff's December 29th letter on February 10, 2011, providing him with an estimate from the pension benefits calculator showing that Plaintiff would have received $3,206.74 if he had commenced benefits on November 1, 2008 (the earliest possible date after his actual retirement) and that Plaintiff would have received $3,628.20 if he commenced benefits at age 65 (normal retirement, the latest commencement date), a difference of $421.46 a month. On February 14, 2011, Plaintiff again wrote to the EBC asking for a reversal.

The EBC communicated its final decision to Plaintiff on February 23, 2011. Thereafter, Plaintiff continued to correspond with the EBC. On February 25, 2011, Plaintiff acknowledged his receipt of the EBC's denial letter. On March 15, 2011, Plaintiff requested the versions of the Plan's summary plan description and plan document that were in force in 2008 and

9

in 2011. Lilly provided Plaintiff with the requested copies within ten days thereafter.

**Plaintiff's Current Lawsuit**

Plaintiff filed this lawsuit in federal court on July 13, 2012. His sole claim states:

> The Plaintiff was going to retire from [Defendant] on October 30, 2008. The Plaintiff called the Benefits Helpdesk on October 8, 2008 and asked, "If I start taking my pension benefit on November 1, 2008 or wait 5 years to start taking my benefits, will there be a difference in the amount of benefits that I would receive?" The answer the Plaintiff received from the person at the Helpdesk was, "Yes, there will be a substancial (sic) difference."

Dk. 1, p. 3. Defendant answered that this Court has jurisdiction pursuant to § 502(e)(1) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(e)(1). Dk. 2. Defendant then filed this motion for summary judgment based on contractual limitations, release, and failure to state a claim for relief.

**IV. Discussion**

**A. Bar of Plan Benefits by Contractual Limitation in Plan**

Defendant first contends that Plaintiff's action is time-barred by a one-year limitations period in the Plan. Defendant relies on Section 10.06 of the 2008 Plan, entitled "Limitations Period for Lawsuits," which provides:

> No legal action may be commenced or maintained against the Plan more than one year after the Employee Benefits Committee wholly or partially denies, or is deemed to have wholly or partially denied, a claim for Plan benefits.

Dk. 20, Exh. A, 2008 Plan, p. 53, FLH000259. (The 2011 Plan contains identical language.)[3]

It is uncontested that the final administrative denial of Plaintiff's claim for Plan benefits by the EMC was on February 23, 2011, and that Plaintiff did not file this lawsuit until July 13, 2012, more than a year later. Plaintiff responds that he repeatedly requested but did not receive a copy of the Plan until March 24, 2011; that the Plan was not included in his Severance Agreement; and that the Plan's limitation provision is therefore irrelevant to this case. Dk. 33, 38.

Plaintiff's assertion that he repeatedly requested a copy of the Plan before March of 2011 is non-specific and is not supported by the record. Plaintiff engaged in much correspondence with Defendant, but none of his letters of record request plan documents prior to March of 2011. Instead, Plaintiff's March 15th letter indicates that he had consulted with an attorney who had asked him to obtain the Plan documents, and does not indicate that Plaintiff had ever requested them previously. Although discovery has been stayed in this case, Plaintiff does not need discovery to mount the necessary proof, if proof there be, that he wrote a letter asking for plan documents prior to March of 2011. Plaintiff could have obtained copies of the plan documents upon written request at any time, *see* 29 USC § 1024(b)(4),

---

[3] The Court finds this time period reasonable because it did not begin to run until the EBC denied Plaintiff's appeal. Plaintiff thus had ample time in which to file a claim after the administrative process concluded.

triggering Defendant's duty to provide them. The record is thus uncontradicted that Plaintiff first made a written request for the plan documents on March 15, 2011, and that he timely received them on March 24, 2011.

Plaintiff additionally contends that the Plan is irrelevant because it is not referenced in the Severance Agreement. But Plaintiff fails to show that the law requires a severance agreement to incorporate, expressly refer to, or even allude to an employer's employee benefit plan. Even assuming the existence of such a requirement, it is met in this case. Plaintiff's Severance Agreement makes various references to the "employee benefit plan" sponsored or maintained by the Defendant. *See* Dk. 20, Exh. A, Severance Agreement, pp. 2, 3, 5, FLH000054, 55, 57. Those references are sufficient to put a reader on notice of the existence of the employee benefit plan and of the potential interaction between the two. *See id.*,re: "Employee Benefit Plan Appeals."

Having raised no material question of fact about the applicability, accrual, or effect of the limitations clause in the Plan, Plaintiff is bound by its terms. To the extent Plaintiff's claim may be construed as one for "Plan benefits," his claim is untimely, having commenced more than one year after the EBC denied his claim for Plan benefits.[4]

---

[4] In an abundance of caution, the Court has reviewed the denial of Plan benefits based on the limitations clause *de novo*, although it would reach the same result by applying an arbitrary and capricious standard of review. *See generally Eugene S. v. Horizon Blue Cross Blue Shield of New Jersey,* 663 F.3d 1124, 1130-1131 (10th Cir. 2011).

**B. Release by Severance Agreement**

Defendant additionally contends that Plaintiff's claim, whether or not

for Plan benefits, was released by the Severance Agreement.

In exchange for benefits under the Severance Agreement, Plaintiff

agreed to release all his claims, stating:

> [I] give up all of My Claims to the fullest extent permitted by law,
> and I agree to abide by this Agreement in all respects. I will not
> bring any lawsuits against the Company or make any demands
> against the Company for compensation or damages relating to
> My Claims. The Severance Benefit that I am receiving under this
> Plan is a fair compromise for my undertakings in this Agreement.

(Emphases added.) (Elliott Affidavit, Ex. A-1, LLY-FLH000055).

46.

The Severance Agreement defines "My Claims" broadly and at length,

specifically barring not only claims under any employee benefit plan, but

also claims for failure to keep any promise, for breach of a covenant of good

faith and fair dealing, for breach of fiduciary duty, and for estoppel:

> My Claims mean, except as specifically excluded in the last
> paragraph of this section following item G.8 below, all of my
> rights that I now have to any personal relief of any kind from the
> Company, including without limitation: . . .
> 2. all claims arising out of or relating to actual or alleged
> statements, actions, or omissions of the Company; . . .
> 4. all claims for . . . breach of contract; breach of implied
> contract; failure to keep any promise; breach of a covenant of good
> faith and fair dealing; breach of fiduciary duty; estoppel; my
> activities, if any, as an actual or alleged "whistleblower";
> defamation; infliction of emotional distress; fraud;
> misrepresentation; negligence; harassment; retaliation or reprisal;
> . . . any other wrongful employment practices; and violation of any
> other principle of common law;
> 5. all claims for compensation or monetary damages of any

kind . . . ;
6. all claims for reinstatement or other personal equitable
relief, back pay, front pay, compensatory damages, damages for
alleged personal injury, liquidated damages, and punitive damages;
7. all claims under any employee benefit plan sponsored
or maintained by the Company (except as otherwise provided in
this Agreement); and
8. all claims for attorneys' fees, costs, and interest.

 (Elliott Affidavit, Ex. A-1, LLY-FLH000053-54, Paragraph G of Definition

section). This language includes the Plaintiff's claim for damages in this case,

regardless of the legal theory Plaintiff relies on.

    The Agreement specifically provided that Plaintiff would "receive any

and all vested benefits to which [he] may be entitled as of [his] Actual

Termination Date, including any benefits under The Lilly Retirement Plan" in

accordance with the terms of that plan. *Id.*, at LLY-FLH000055. *See id* at 54,

clause following 8 ("However, My Claims does not include any claims for

vested benefits payable under the terms of a plan qualified under Section

401(a) of the Internal Revenue Code of 1986 . . . .").

    Plaintiff agreed that the Severance Agreement "should be

interpreted as broadly as possible to achieve [his] intention to resolve all of

[his] Claims against the Company and to otherwise fulfill [his] obligations

under this Agreement." (Elliott Affidavit, Ex. A-1, LLY-FLH000058). Plaintiff

also affirmed that he read and understood the Severance Agreement and

had not relied on any statements made by the Defendant not included in the

Agreement:

> I have read this Agreement carefully. I understand all of its terms. In signing and dating this Agreement, I have not relied on any statements or explanations made by the Company except as specifically set forth in this Agreement. I am voluntarily releasing My Claims against the Company and undertaking my other obligations under this Agreement. I intend this Agreement to be legally binding.

(Emphasis added.) (Elliott Affidavit, Ex. A-1, LLY-FLH000059). Plaintiff additionally acknowledged his understanding that he was advised by Defendant to consult with an attorney before signing the Severance Agreement. *Id.*, p. 5.

The Severance Agreement also reflects that Plaintiff received a copy of it on or before August 8, 2008, and had the right to take until October 30, 2008, to consider whether he wished to sign it. *Id.*, FLH000057. Plaintiff took that entire time, as evidenced by his signature dated October 30th. Plaintiff does not show that he requested a copy of the Plan between those dates, and Defendant shows that copies of its Plan are available upon written request by employees. The law requires no more.

### 1. Defendant Invited Administrative Appeal

Despite the broad, clear, and unambiguous language of the Severance Agreement, Plaintiff contends that he did not release his current claim because the Defendant, in a letter dated June 16, 2010, directed him to the Benefit Determination Review Team to initiate a claim determination. Dk. 33, Exh. 1. Plaintiff contends that this was either a "bogus appeal process" or a purposeful effort to deceive him into violating the terms of his Severance Agreement.

The Court finds no ill will shown by Defendant's June 16th letter. That letter was written *in response* to Plaintiff's request for a claim determination. Defendant properly notified Plaintiff of his right to file a claim regarding his ERISA plan, and how to do it. Specifically, Defendant's letter stated that the Benefit Determination Review Team would review Plaintiff's claim, but advised Plaintiff that to file a claim under ERISA he was required to complete a Claim Initiation Form, and told him how to obtain one. Nothing in that letter assists Plaintiff's contention that his release is ineffective.

## 2. Vested Benefits Exception

Plaintiff additionally claims he falls within the stated exception which preserves claims for "vested benefits payable under the terms of a plan qualified under Section 401(a) of the Internal Revenue Code of 1986," and vested benefits to which he was entitled as of his Actual Termination Date, including any benefits under The Lilly Retirement Plan.

ERISA plans are required to provide an appeal process to their participants. *See* 29 USC § 1133. That appeals process is for those seeking vested benefits under the Plan's terms – a right which was reserved to Plaintiff under his Severance Agreement. To the extent Plaintiff sought those benefits, he was required to exhaust the administrative procedures provided by the Defendant. *Whitehead v. Oklahoma Gas & Elec. Co.*,187 F.3d 1184 (10th Cir. 1999). Plaintiff did not release his right to bring such a claim, but was required to file it within the stated time period. As noted above, to the

16

extent Plaintiff is seeking vested benefits, he barred not by the release stated in the Severance Agreement, but by the limitations period established in the Plan.

To the extent Plaintiff is not seeking vested benefits under the Plan, but damages from his detrimental reliance an oral misrepresentation made by a benefits helpdesk employee, Plaintiff has failed to raise a genuine issue of material fact that he did not release that claim.

### C. Estoppel/Misrepresentation

Alternatively, Defendant additionally moves for summary judgment contending that Plaintiff's legal theory of equitable estoppel is not recognized in the Tenth Circuit in matters related to ERISA cases.

While some other circuits have created a federal common-law cause of action premised on equitable estoppel in the ERISA context, the Tenth Circuit does not permit promissory estoppel claims regarding ERISA matters, whether brought under state or federal common law.

> ERISA preempts state law causes of action, including state law promissory estoppel claims. *See Averhart v. U.S. WEST Mgmt. Pension Plan,* 46 F.3d 1480, 1485 (10th Cir. 1994). While some other circuits have created a federal common-law cause of action premised on equitable estoppel in the ERISA context, *see, e.g., Pell v. E.I. DuPont de Nemours & Co.*, 539 F.3d 292, 300 (3d Cir.2008), we have yet to recognize such a claim. *Callery v. U.S. Life Ins. Co.*, 392 F.3d 401, 407 (10th Cir. 2004).

*Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 962 (10th Cir. 2011),

Instead, the Tenth Circuit expressly rejected the federal common law estoppel theory in *Miller v. Coastal Corp.*, 978 F.2d 622 (10th Cir. 1992),

*cert. denied*, 507 U.S. 987 (1993), where a participant allegedly relied on informal written modifications to an employee benefit plan. ERISA requires all modifications to an employee benefit plan to be written, 29 U.S.C. § 1102(a)(1), and to conform to formal amendment procedures, 29 U.S.C. § 1102(b)(3).

Attempted oral modifications of an ERISA plan meet the same fate. As the Tenth Circuit held in in *Straub v. Western Union Telegraph Co.*, 851 F.2d 1262, 1265 (10th Cir. 1988), "no liability exists under ERISA for purported oral modifications of the terms of an employee benefit plan." Thus "the coverage of an ERISA plan may not be enlarged by informal written or oral communications under a theory of federal common law estoppel." *Alexander v. Anheuser-Busch Companies, Inc.*, 990 F.2d 536 (10th Cir. 1993). *See also Peckham v. Gem State Mut.*, 964 F.2d 1043, 1050 (10th Cir. 1992) (applying *Straub* to conclude that claims based on the doctrine of promissory estoppel are precluded by ERISA).

The Tenth Circuit may recognize one exception to that general rule in "egregious cases":

> We have left open the possibility that an ERISA estoppel claim might be viable in "egregious cases," such as where the employer lied, engaged in fraud, or intended to deceive the participants, *id.* at 407–08, or where the claim was premised on the employer's interpretation of an ambiguous provision in the plan, *Averhart,* 46 F.3d at 1486.

*Kerber*, 647 F.3d at 962.

But neither Plaintiff's complaint not Plaintiff's briefs allege any such act by the Defendant. *See* Dk. 1. Even when the Court considers Plaintiff's related briefs, Plaintiff alleges only that he was provided with "wrong information." Dk. 46, p. 1 (alleging that "Lilly and their (sic) contractor Aon Hewitt Benefit Payment Service, LLC (Hewitt) provided wrong information on October 8, 2008…") This fails to allege a lie, fraud, or intent to deceive, so does not fall within the limited possible exception stated above, but rests within the general rule precluding equitable estoppel claims in this context.

But even if Plaintiff sufficiently alleges a "lie," the egregiousness of the conduct alleged in the present case is significantly less than that in *Miller*, where the Tenth Circuit declined to invoke the exception to the general rule precluding estoppel in ERISA cases. *See Kaferly v. U.S. West Technologies*, 189 F.3d 478 (Table) (10th Cir. 1999). Assuming, arguendo, that the law permits Plaintiff to bring an equitable estoppel claim, Plaintiff has failed to raise a genuine issue of material fact that he could prevail on the merits of that claim. The Tenth Circuit has cited the following elements of a common-law claim of equitable estoppel in the ERISA context:

> (1) the party to be estopped misrepresented material facts; (2) the party to be estopped was aware of the true facts; (3) the party to be estopped intended that the misrepresentation be acted on or had reason to believe the party asserting the estoppel would rely on it; (4) the party asserting the estoppel did not know, nor should it have known, the true facts; and (5) the party asserting the estoppel reasonably and detrimentally relied on the misrepresentation.

*Cannon v. Group Health Service of Oklahoma, Inc.*, 77 F.3d 1270, 1276 -

77 (10th Cir. 1996), *cert. denied*, 519 U.S. 816 (1996).

Plaintiff fails to raise a material question of fact as to whether he could

meet several of these elements. First, the Helpdesk employee's statement

that there would be a "substantial difference" if Plaintiff waited five years to

begin receiving benefits is vague, general, and opinion-based, not a material

fact. To be actionable, an alleged misrepresentation "must relate to past or

present fact, as opposed to mere opinions or puffing or promised actions in

the future." *Timi v. Prescott State Bank,* 220 Kan. 377, 389 (1976)

(regarding fraud). *See Sunflower Pork, Inc. v. Consolidated Nutrition, L.C.,*

2004 WL 1212052, *17 (D.Kan. 2004) (finding representation of "substantial

financial involvement" not actionable because it is "not a statement of fact,

but rather is more akin to puffing, or opinion"). Whether an extra $421.46 a

month in retirement benefits is deemed to be "minimal" or "substantial" will

vary with the person, thus the representation of a "substantial difference" is

not an actionable misstatement of fact.

Second, no facts suggest that the Helpdesk employee intended for the

Plaintiff to act on her vague statement, or foresaw that he would. Thirdly,

the record does not show that the Plaintiff neither knew nor should have

known the true facts, or that he reasonably relied on the alleged

misstatement. Instead, Plaintiff had used the online calculator multiple times

to calculate his potential benefits, and had actual knowledge of the specific amounts of benefits he would receive based on the dates he selected.

For the multiple reasons stated above, Defendant's motion for summary judgment must be granted.

IT IS THEREFORE ORDERED that Defendant Eli Lilly and Company's motion for summary judgment (Dk. 18) is granted.

IT IS FURTHER ORDERED that Defendant's motions to strike Docket 38 and Docket 41 are granted.

IT IS FURTHER ORDERED that Plaintiff's motion for leave to file a surreply (Dk. 45) is denied.

Dated this 11th day of December, 2012, at Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge